In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-3770

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

STEVEN M. SKOIEN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 08-CR-12—**Barbara B. Crabb**, *Chief Judge.*

ARGUED APRIL 6, 2009—DECIDED NOVEMBER 18, 2009

Before BAUER, SYKES, and TINDER, *Circuit Judges.*

SYKES, *Circuit Judge.* A grand jury indicted Steven Skoien for possessing a firearm after having been convicted of a misdemeanor crime of domestic violence in violation of 18 U.S.C. § 922(g)(9). Skoien moved to dismiss the indictment, arguing that applying the federal statute to him violated his Second Amendment right to keep and bear arms as explained in *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008). The district court

denied the motion. Skoien pleaded guilty but reserved his right to appeal the district court's denial of his motion to dismiss the indictment. He now reiterates his Second Amendment challenge to § 922(g)(9).

The government has approached this case as though all it had to do to defend the constitutionality of § 922(g)(9) is invoke *Heller*'s language about certain "presumptively lawful" gun regulations—notably, felon-dispossession laws. Not so. *Heller* held that the Second Amendment secures an individual natural right to possess firearms for self-defense; the opinion's reference to exceptions cannot be read to relieve the government of its burden of justifying laws that restrict Second Amendment rights. Although *Heller* did not settle on a standard of review, it plainly ruled out the deferential rational-basis test; this leaves either strict scrutiny or some form of "intermediate" review. On the facts of this case, we hold that intermediate scrutiny applies. In its usual formulation, this standard of review requires the government to establish that the challenged statute serves an important governmental interest and the means it employs are substantially related to the achievement of that interest.

Skoien was convicted in state court of misdemeanor domestic battery and was placed on probation. About a year later his probation agent found a hunting shotgun in a truck parked outside his home. Skoien admitted he had gone deer hunting that morning and used the shotgun to kill a deer. He argued below and maintains here that prosecuting him under § 922(g)(9) for possessing the

shotgun violates his Second Amendment right to bear arms for hunting. He has not, however, asserted a right to possess the gun for self-defense.

As such, the government's application of § 922(g)(9) in this case requires less rigorous justification than strict scrutiny because the core right of self-defense identified in *Heller* is not implicated. Applying intermediate scrutiny, we ask whether the government has established that the statute is substantially related to an important governmental interest. No one questions the importance of the government's interest in protecting against domestic-violence gun injury and death. The dispute here is about the fit between this important objective and § 922(g)(9)'s blanket ban on firearms possession by persons who have been convicted of a domestic-violence misdemeanor. Under intermediate scrutiny, the government need not establish a close fit between the statute's means and its end, but it must at least establish a *reasonable* fit. The government has done almost nothing to discharge this burden. Instead, it has premised its argument almost entirely on *Heller*'s reference to the presumptive validity of felon-dispossession laws and reasoned by analogy that § 922(g)(9) therefore passes constitutional muster. That's not enough. Accordingly, we vacate Skoien's conviction and remand to the district court for further proceedings consistent with this opinion.

## I. Background

In 2006 Steven Skoien was convicted of domestic battery in Wisconsin state court and was sentenced to two years'

probation. Skoien was prohibited from possessing fire-
arms both as a condition of his probation and because
federal law prohibits any person convicted in any
court of a misdemeanor crime of domestic violence from
possessing a firearm. 18 U.S.C. § 922(g)(9); *see also* 18 U.S.C.
§ 921(a)(33)(A)(ii) (defining a misdemeanor crime of
domestic violence as any offense that "has, as an element,
the use or attempted use of physical force, or the threat-
ened use of a deadly weapon"). In 2007 Wisconsin proba-
tion agents learned that Skoien had purchased a deer-
hunting license. Believing that Skoien had acquired a
gun in violation of his probation, they searched his
home and a pickup truck parked outside the home; they
found a Winchester 12-gauge shotgun in the bed of the
truck. Skoien admitted he had used the shotgun, which
belonged to his father, to go deer hunting earlier that day.
This was corroborated by other evidence found in the
truck; namely, a blaze orange hunting jacket, ammunition,
and a state-issued tag for a gun deer kill in the name of
Steven Skoien. The deer carcass was in Skoien's garage.
A federal grand jury indicted Skoien for possessing a
firearm after having been convicted of a domestic-
violence misdemeanor in violation of 18 U.S.C. § 922(g)(9).[1]

---

[1] The probation search also turned up two firearms in Skoien's
home, a Winchester .308-caliber rifle and a Paramount .25-
caliber handgun. Skoien was indicted for possessing all three
guns, but the prosecutor conceded at Skoien's change-of-plea
hearing that he could not prove the handgun and the rifle
found in the home were Skoien's. Some evidence apparently
(continued...)

Skoien moved to dismiss the indictment, arguing that applying this statute to him violated his Second Amendment right to bear arms. The district court denied the motion, citing this court's decision in *Gillespie v. City of Indianapolis*, 185 F.3d 693 (7th Cir. 1999), which held that § 922(g)(9) was constitutional under a collective-rights view of the Second Amendment. Skoien entered a conditional guilty plea, reserving his right to appeal the district court's Second Amendment ruling. After the Supreme Court decided *Heller*, Skoien renewed his motion to dismiss the indictment. The district court denied the motion a second time, holding that § 922(g)(9) remained constitutional after *Heller*. The judge said she would "assum[e] that the highest standard [of scrutiny] applies," and concluded that the statute was "narrowly tailored [because] it applies only to persons who have been found guilty by a court of domestic violence" and "[t]he government has a compelling interest in protecting the families of such persons." The judge also relied on the passage in *Heller* presumptively approving felon-dispossession laws. *See Heller*, 128 S. Ct. at 2816-17

---

[1] (...continued)
suggested that the handgun belonged to Skoien's wife, Gidget, and the rifle belonged to Darin Rudolph, their roommate. Accordingly, Skoien's conditional guilty plea was based only on his possession of the Winchester hunting shotgun found in the truck. At sentencing, however, Skoien did not contest "constructive possession" of the two additional guns for purposes of increasing his base offense level by two levels under U.S.S.G. § 2K2.1(b)(1)(A).

("nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons"). The judge read this language as "an explicit recognition of the fact that persons may forfeit their Second Amendment right to bear arms along with other rights when they commit serious crimes."

The case proceeded to sentencing, and the court imposed a sentence of two years in prison. Skoien appealed, reasserting his argument that applying § 922(g)(9) to him violates his Second Amendment right to bear arms as explained in *Heller*.

## II. Discussion

We have previously upheld the constitutionality of § 922(g)(9) under a collective-rights interpretation of the Second Amendment. *Gillespie*, 185 F.3d at 711. *Heller*'s rejection of that understanding of the Second Amendment displaces *Gillespie* and requires us to reconsider the constitutionality of the statute as applied in this case.

*Heller* held that the Second Amendment secures an individual natural right to keep and bear arms for defense of self, family, and home. 128 S. Ct. at 2797-99. After a lengthy analysis of the text of the Amendment and the founding-era sources of its original public meaning, the Supreme Court held that the Amendment guarantees an individual right of armed defense not limited to militia service. *Id.* at 2801. The Court began with an analysis of the language of the "operative clause" of the Second Amendment—"the right of the people to keep and

bear Arms, shall not be infringed," U.S. CONST. amend. II—and consulted historical source materials to identify the meaning of this language at the time of its adoption. As to this "operative clause," the Court concluded:

> Putting all of the[] textual elements together, we find that they guarantee the individual right to possess and carry weapons in case of confrontation. This meaning is strongly confirmed by the historical background of the Second Amendment. We look to this because it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right. The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it "shall not be infringed." As we said in *United States v. Cruikshank,* 92 U.S. 542, 553, 23 L. Ed. 588 (1876), "[t]his is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The Second amendment declares that it shall not be infringed . . . ."

*Heller*, 128 S. Ct. at 2797-98.[2]

The Court then moved to the meaning of the Amendment's "prefatory clause"—"[a] well regulated Militia, being necessary to the security of a Free State." U.S. CONST.

---

[2] For an interesting discussion of *Heller* and the foundations of the natural right of armed defense in Western philosophy, see David B. Kopel, *The Natural Right of Self-Defense: Heller's Lesson for the World*, 59 SYRACUSE L. REV. 235 (2008).

amend. II. After reviewing the historical background relevant to the interpretation of the militia clause, the Court concluded that the clause described the motivating purpose for the codification of the natural right—to prevent the new government from destroying the militia by disarming the citizenry—but was not a limitation on the scope of the right. More specifically, the Court held:

> It is therefore entirely sensible that the Second Amendment's prefatory clause announces the purpose for which the right was codified: to prevent elimination of the militia. The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting. But the threat that the new Federal Government would destroy the citizens' militia by taking away their arms was the reason that right—unlike some other English rights—was codified in a written Constitution.

*Heller*, 128 S. Ct. at 2801.

Applying this understanding of the Second Amendment, the Supreme Court invalidated the District of Columbia's comprehensive prohibition on handgun possession. *Id.* at 2821-22. Because "the inherent right of self-defense has been central to the Second Amendment right" and because the District's ban on handgun possession "extends . . . to the home, where the need for defense of self, family, and property is most acute," the D.C. gun ban could not coexist with the Amendment. *Id.* at 2817-18.

This was so, the Court said, "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Id.* at 2817. The Court held that "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 2821.

But the Court also added this:

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places, such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 2816-17. The Court said in a footnote that it was "identify[ing] these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 2817 n.26.

There are several ways to understand this limiting language. We note for starters that it is dicta, and although we can hardly ignore it, we think it would be a mistake to uphold this or other gun laws simply by invoking the Court's reference to these "presumptively lawful regulatory measures," without more. But beyond that, it is not entirely clear whether this language should be taken to suggest that the listed firearms regulations are presumed to fall outside the scope of the Second Amendment right as it was understood at the time of the framing or that they are presumptively lawful under

even the highest standard of scrutiny applicable to laws that encumber constitutional rights. The Court said it was not attempting "an exhaustive historical analysis today of the full scope of the Second Amendment," *id.* at 2816, and specifically deferred judgment on the outer limits of its original meaning: "[T]here will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us," *id.* at 2821. The Court also conspicuously declined to set a standard of review. *Id.* at 2817. We take all this to mean that gun laws— other than those like the categorically invalid one in *Heller* itself—must be independently justified.

But by what kind of justification? Although the language about presumptive exceptions makes for some analytical difficulty, we read *Heller* as establishing the following general approach to Second Amendment cases. First, some gun laws will be valid because they regulate conduct that falls outside the terms of the right as publicly understood when the Bill of Rights was ratified. If the government can establish this, then the analysis need go no further. If, however, a law regulates conduct falling *within* the scope of the right, then the law will be valid (or not) depending on the government's ability to satisfy whatever level of means-end scrutiny is held to apply; the degree of fit required between the means and the end will depend on how closely the law comes to the core of the right and the severity of the law's burden on the right. *See generally* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56

UCLA L. REV. 1443 (2009) (describing the scope, burden, and danger-reduction justifications for gun regulations post-*Heller*).

So constitutional text and history come first, then (if necessary) an analysis of the public-benefits justification for the regulation follows.[3] If the first inquiry into the founding-era scope of the right doesn't resolve the case, then the second inquiry into the law's contemporary means-end justification is required. *See generally* Nelson Lund, *The Second Amendment, Heller, and Originalist Jurisprudence*, 56 UCLA L. REV. 1343, 1372-75 (2009) (proposing this sort of sequential analysis of Second Amendment challenges post-*Heller*); *see also* Adam Winkler, *Heller's Catch-22*, 56 UCLA L. REV. 1551, 1572-73 (2009); Glenn H. Reynolds & Brannon P. Denning, *Heller's Future in the Lower Courts*, 102 NW. U. L. REV. 2035 (2008). This approach gives effect to the Supreme Court's emphasis on the original public meaning of the Second Amendment right; it also attempts to reconcile the Court's invalidation

---

[3] The First Circuit recently upheld a different subsection of 18 U.S.C. § 922—§ 922(x)(2)(A), a restriction on juvenile possession of handguns—by consulting historical evidence of federal and state restrictions on handgun possession by minors. *See United States v. Rene E.*, 583 F.3d 8 (1st Cir. 2009). The court concluded that the founding-era understanding of the Second Amendment right likely excluded juvenile handgun possession from the scope of the right. The court therefore did not proceed to the question of the standard of review or specifically address the public-benefits justification for § 922(x)(2)(A).

of the D.C. gun ban "under any standard of scrutiny" with its reference to the existence of "presumptively lawful" exceptions to the right to keep and bear arms.

Applying this framework here, the first inquiry doesn't resolve the question whether § 922(g)(9) violates Skoien's Second Amendment right to bear arms. To begin with, the government hasn't argued that a domestic-violence misdemeanant like Skoien or the particular firearm he possessed—a shotgun used primarily for deer hunting—falls outside the scope of the Second Amendment as understood at the time of its adoption. Indeed, it would be odd to argue that a conventional hunting gun is wholly unprotected by the Second Amendment. *Heller* referred to the founding-era importance of the right to bear arms "for self-defense *and hunting*," 128 S. Ct. at 2801 (emphasis added), and a long gun used primarily for hunting is obviously useful for defensive purposes as well. *Heller* gave some consideration to the types of arms that are or may be unprotected by the Second Amendment, *see id.* at 2815-17 (explaining generally that the sorts of weapons protected are those that were in common civilian use for lawful purposes at the time the Amendment was ratified), but nothing in this part of the opinion remotely suggests that a standard hunting shotgun is excluded.[4]

---

[4] Scholarly commentators have raised some practical and historical questions about this aspect of *Heller*. *See, e.g.,* Volokh, *supra*, at 1479-83 (discussing some difficulties in applying
(continued...)

A more difficult question is whether a person con-
victed of a domestic-violence misdemeanor is categori-
cally excluded from exercising the Second Amendment
right as a matter of founding-era history and back-
ground legal assumptions. The government has not
made this argument, either. Scholars disagree about
whether and to what extent persons convicted of
crimes—more specifically, *felons*—were considered ex-
cluded from the right to bear arms during the
founding era. *Compare, e.g.*, C. Kevin Marshall, *Why Can't
Martha Stewart Have a Gun?*, 32 HARV. J.L. & PUB. POL'Y
695, 714-28 (2009) (maintaining that the founding-era
understanding of the right to keep and bear arms for self-
defense did not categorically exclude persons convicted
of a crime), *with* Don B. Kates & Clayton E. Cramer,
*Second Amendment Limitations and Criminological Con-
siderations*, 60 HASTINGS L.J. 1339, 1359-64 (2009) (main-
taining that the founding-era understanding excluded
felons from firearms possession), *and* Don B. Kates, Jr.,
*Handgun Prohibition and the Original Meaning of the Second
Amendment*, 82 MICH. L. REV. 204, 266 (1984) (same); *see
also* Winkler, *supra,* at 1562-66; Lund, *supra*, at 1356-57;
Glenn Harlan Reynolds, *A Critical Guide to the Second
Amendment*, 62 TENN. L. REV. 461, 480 (1995) (collecting
originalist scholarship). The federal prohibition on fire-
arms possession by felons, 18 U.S.C. § 922(g)(1), was not

---

[4] (...continued)
this test); Lund, *supra*, at 1362-67 (questioning the historical
basis for this aspect of *Heller*).

enacted until 1968, although a narrower predecessor prohibition had been in place since the 1930s. *See* Marshall*, supra,* at 698-707 (describing the history of federal-felon disarmament). Section 922(g)(9)'s ban on firearms possession by domestic-violence misdemeanants is quite new; it was enacted in 1996. *See* Pub. L. No. 104-294, § 603(g), 110 Stat. 3488, 3504 (1996) (the "Lautenberg Amendment," adding subsections (g)(8) and (g)(9) to 18 U.S.C. § 922).

We need not resolve the historical question here. Short of a wholly conclusory statement that domestic-violence misdemeanants, like felons, "forfeit" their Second Amendment rights, the government has not tried to justify § 922(g)(9) on this basis. We therefore assume that Skoien's Second Amendment rights are intact notwithstanding his misdemeanor domestic-violence conviction.

This brings up the second inquiry, which asks whether the restriction on Skoien's right to bear arms is justified under the applicable standard of review for evaluating laws that burden constitutional rights. This requires that we decide on a level of scrutiny—a question, as we have noted, the Supreme Court expressly reserved in *Heller*. We know that rational-basis review is out; *Heller* was explicit about that. 128 S. Ct. at 2818 n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibition on irrational laws, and would have no effect."). This leaves either strict scrutiny—typically reserved for

laws that classify on the basis of race or restrict certain fundamental rights, *Clark v. Jeter*, 486 U.S. 456, 461 (1988), and content-based restrictions on speech, *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 813 (2000)—or some form of intermediate scrutiny.

We take our cues about the appropriate standard of review from the language of *Heller*'s holding and that enigmatic reference to "presumptively lawful" gun regulations. In invalidating the D.C. handgun ban, the Supreme Court emphatically identified the right of law-abiding citizens to possess arms for self-defense as the central concern of the Second Amendment: "[W]hatever else it leaves to future evaluation, [the Second Amendment] surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 128 S. Ct. at 2821. The Court held that "[u]nder *any* . . . standard[] of scrutiny[,] . . . banning from the home the most preferred firearm in the nation to keep and use for protection of one's home and family would fail constitutional muster." *Id.* at 2817-18 (emphasis added) (internal quotation marks and citation omitted). In this context, saying a law is unconstitutional "under any standard of scrutiny" means that the law is unconstitutional under any of the *heightened* standards of scrutiny (rational basis having been ruled out)—or perhaps that the law is per se unconstitutional. Either way, this language suggests, at a minimum, that gun laws that severely restrict the core Second Amendment right identified in *Heller*—that of "law-abiding, responsible citizens to use arms in defense of hearth and home," *id.* at 2821—should receive exacting scrutiny.

But applying strict scrutiny to *all* restrictions on gun rights is obviously incompatible with *Heller*'s dicta about "presumptively lawful" firearms laws. Though unexplained, the Court's willingness to presume the constitutionality of various firearms restrictions—especially prohibitions on firearms possession by felons—gives us ample reason to believe that strict scrutiny does not apply here. We do not see how the listed laws could be "presumptively" constitutional if they were subject to strict scrutiny—a point Justice Breyer made (somewhat overbroadly) in dissent. *Id.* at 2851 (Breyer, J., dissenting) ("[T]he majority implicitly, and appropriately, rejects [a strict scrutiny standard] by broadly approving a set of laws—prohibitions on concealed weapons, forfeiture by criminals of the Second Amendment right, prohibitions on firearms in certain locales, and governmental regulation of commercial firearm sales—whose constitutionality under a strict scrutiny standard would be far from clear."). Accordingly, strict scrutiny cannot apply across the board.[5]

---

[5] If strict scrutiny *did* apply here, there is reason to doubt whether Skoien's conviction under § 922(g)(9) could survive Second Amendment challenge. A law subject to strict scrutiny must be narrowly tailored to achieve a compelling governmental interest. *See, e.g., Grutter v. Bollinger*, 539 U.S. 306, 326 (2003). Although "[s]trict scrutiny is not strict in theory, but fatal in fact," *id.* (internal quotation marks omitted), it is an exacting standard and deliberately difficult to pass, in deference to the primacy of the individual liberties the Con-

(continued...)

The Second Amendment challenge in this case is several steps removed from the core constitutional right identified in *Heller*. Section 922(g)(9)'s prohibition on firearms possession extends only to persons convicted of a misdemeanor crime of domestic violence, not the "law-abiding, responsible citizens" whose natural right of armed defense was identified in *Heller* as the central concern of the Second Amendment. As we have explained, this does not necessarily mean that domestic-violence misdemeanants have no Second Amendment rights, but it does support the application of a more

---

[5] (...continued)

stitution secures. Section 922(g)(9) bars *all* persons who have been convicted of a domestic-violence misdemeanor from *ever* possessing a firearm for *any* reason. It is a comprehensive lifetime ban; the prohibition does not expire after a certain period of time, nor does it permit the offender to reacquire the right to possess a gun on a showing that he is no longer a danger. There are no exceptions. The statute does not require any individualized finding that the misdemeanant presents a risk of using a gun in a future crime. Skoien was caught in possession of a hunting shotgun about a year after his domestic-violence misdemeanor conviction, while he was still on probation—not five or ten or twenty years later. Perhaps that should make some difference in the analysis. But while preventing domestic gun crime is unquestionably a compelling governmental interest, *United States v. Salerno*, 481 U.S. 739, 749 (1987), the government has made precious little effort here to establish that § 922(g)(9)'s automatic, exceptionless, and perpetual firearms prohibition is the least restrictive means available to achieve this goal.

lenient standard of review. Moreover, although Skoien's hunting shotgun has obvious utility as a defensive weapon as well as a hunting gun, he has not keyed his constitutional challenge to the right of self-defense identified in *Heller* as the core Second Amendment right. He has claimed only that § 922(g)(9) as applied to him infringes his right to possess his hunting shotgun *for hunting.* We are not suggesting that keeping and bearing firearms for hunting falls outside the scope of the Second Amendment; to the contrary, as we have noted, *Heller* specifically stated that "Americans valued the ancient right . . . for self-defense *and hunting.*" 128 S. Ct. at 2801 (emphasis added). We make this observation only to clarify that § 922(g)(9) as applied in this case does not strike at the heart of the Second Amendment right as explicated in *Heller.* Laws that restrict the right to bear arms are subject to meaningful review, but unless they severely burden the core Second Amendment right of armed defense, strict scrutiny is unwarranted.

That leaves us with intermediate scrutiny, which is less demanding than strict scrutiny and we think the most appropriate standard of review given *Heller*'s reference to "presumptively lawful" gun regulations.[6] This more

---

[6] We note that some district courts have applied intermediate scrutiny to review federal-firearms regulations after *Heller.* *See, e.g., United States v. Miller*, 604 F. Supp. 2d 1162 (W.D. Tenn. 2009) (using intermediate scrutiny to uphold 18 U.S.C. § 922(g)(1), the federal ban on firearms possession by felons); *United States v. Marzzarella*, 595 F. Supp. 2d 596 (W.D. Pa. 2009)

(continued...)

flexible standard generally requires the government to establish that the challenged law is substantially related to an important governmental interest. *Jeter*, 486 U.S. at 461. The Supreme Court has applied a particularly rigorous version of this standard in the context of evaluating laws that classify by gender. In *United States v. Virginia*, the Court held that gender-based classifications will survive intermediate scrutiny only if "the proffered justification is exceedingly persuasive." 518 U.S. 515, 533 (1996) (internal quotation marks omitted). The Court said this "burden of justification is demanding and it rests entirely on the State," which "must show at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achieve-

---

[6] (...continued)

(using intermediate scrutiny to uphold 18 U.S.C. § 922(k), the federal prohibition on possessing a firearm with an obliterated serial number). Others have applied strict scrutiny. *See, e.g., United States v. Engstrum*, 609 F. Supp. 2d 1227 (D. Utah 2009) (applying strict scrutiny and upholding § 922(g)(9)'s prohibition on firearms possession by domestic-violence misdemeanant against an as-applied challenge). Other courts more or less analogize to the list of "presumptively lawful" regulations mentioned in *Heller* without specifying a standard of review. *See, e.g., United States v. Luedke*, 589 F. Supp. 2d 1018, 1021-22 (E.D. Wis. 2009) (upholding application of § 922(g)(8) by analogy to felon-dispossession laws, which are "presumptively" valid under *Heller*); *United States v. Booker*, 570 F. Supp. 2d 161, 163-64 (D. Me. 2008) (using similar analogy to uphold application of § 922(g)(9)).

ment of those objectives." *Id.* (brackets in original) (internal quotation marks and citation omitted).

In the First Amendment free-speech context, the rigor of this heightened form of review tends to fluctuate with the character and degree of the challenged law's burden on the right and sometimes also with the specific iteration of the right. For example, election regulations that encumber the expressive association rights of voters, candidates, and parties are subject to a varying standard of review depending upon the nature and severity of the burden on the right; laws imposing severe burdens get strict scrutiny, while regulatory measures imposing more modest burdens are reviewed more leniently. *See, e.g., Wash. State Grange v. Wash. State Republican Party*, 128 S. Ct. 1184, 1191-92 (2008). More specifically, the Supreme Court has held that election regulations imposing severe burdens must be narrowly tailored to serve a compelling state interest, but regulations imposing lesser burdens need only be reasonable, politically neutral, and justified by an important regulatory interest. *Id.*; *see also Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (ballot-access restrictions are subject to a flexible standard of review that weighs the "character and magnitude of the asserted injury to the rights protected . . . against the precise interests put forward by the [government] . . . taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights" (internal quotation marks omitted)); *Lee v. Keith*, 463 F.3d 763, 768 (7th Cir. 2006) (referring to the *Burdick* standard as a flexible "sliding scale").

Similarly, in the commercial-speech context, the Court applies an intermediate standard of scrutiny that accounts for the "subordinate position" that commercial speech occupies "in the scale of First Amendment values." *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (1989) (internal quotation marks omitted). This standard requires "a fit between the legislature's ends and the means chosen to accomplish those ends, . . . a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Id.* at 480 (internal quotation marks and citation omitted); *see also Annex Books, Inc. v. City of Indianapolis*, 581 F.3d 460, 462 (7th Cir. 2009) (applying intermediate scrutiny to municipal regulation of adult bookstores and requiring "evidence that the restrictions actually have public benefits great enough to justify any curtailment of speech"). The Court's speech-forum doctrine also uses a two-tiered standard of review. Regulations in a traditional public or designated public forum get strict scrutiny; restrictions on speech in a nonpublic forum "must not discriminate on the basis of viewpoint and must be reasonable in light of the forum's purpose." *Choose Life Ill., Inc. v. White*, 547 F.3d 853, 864 (7th Cir. 2008) (internal quotation marks omitted).

Adapting this doctrine to the Second Amendment context makes sense. The Second Amendment is no more susceptible to a one-size-fits-all standard of review than any other constitutional right. Gun-control regulations impose varying degrees of burden on Second Amendment rights, and individual assertions of the right will

come in many forms. A severe burden on the core Second Amendment right of armed self-defense should require strong justification. But less severe burdens on the right, laws that merely regulate rather than restrict, and laws that do not implicate the central self-defense concern of the Second Amendment, may be more easily justified.

What this means more specifically is that for gun laws that do not severely burden the core Second Amendment right of self-defense there need only be a "reasonable fit" between an important governmental end and the regulatory means chosen by the government to serve that end. *See Fox*, 492 U.S. at 480. This "require[s] the government goal to be substantial, and the cost to be carefully calculated." *Id.* The inquiry tests whether the regulation's "scope is in proportion to the interest served," *id.* (internal quotation marks omitted), but also accounts for "the difficulty of establishing with precision the point at which restrictions become more extensive than their objective requires," *id.* at 481.

This intermediate standard is "far different" from rational-basis review, however. *Id.* at 480. Under rational-basis review, "it suffices if the law could be thought to further a legitimate governmental goal, without reference to whether it does so at inordinate cost." *Id.* Stated differently, under the prevailing rational-basis test, the challenged law is presumed to be constitutional, and "all a court need do is ask whether a sound justification of a law may be imagined." *Annex Books*, 581 F.3d at 463. Intermediate scrutiny, like strict scrutiny, reverses the presumption. The government "bears the burden of

justifying its restrictions, [and] it must affirmatively establish the reasonable fit" that the test requires. *Fox*, 492 U.S. at 480 (internal citation omitted). In other words, "the public benefits of the restrictions must be established by evidence, and not just asserted[;] . . . . lawyers' talk is insufficient." *Annex Books*, 581 F.3d at 463.

The version of intermediate scrutiny articulated in *Fox* seems most appropriate here because Skoien's constitutional challenge does not implicate the core Second Amendment right of armed self-defense identified in *Heller.* Applying it, we need not spend much time addressing whether reducing domestic gun violence qualifies as an important governmental interest; the Supreme Court has already held that it does, *see United States v. Salerno*, 481 U.S. 739, 749 (1987) ("the government's interest in preventing crime . . . is both legitimate and compelling"), and Skoien does not argue otherwise. The disputed question here is the relationship between the government's means and its end— whether there is a "reasonable fit" between the perpetual disarmament of domestic-violence misdemeanants and the important goal of preventing gun violence against domestic intimates. We cannot resolve this question on the present state of the record; the government has made little effort to discharge its burden of demonstrating the relationship between § 922(g)(9)'s means and its end.

The government has rested nearly its entire case on *Heller*'s reference to felon-dispossession laws, asserting, without analysis, that "Congress permissibly concluded that a narrow additional range of serious criminal

offenses should likewise result in the forfeiture of the right to possess a firearm, even though the offenses are defined as misdemeanors under applicable law." For support the government cites a statement in the *Congressional Record* from the principal Senate sponsor of § 922(g)(9) discussing the purpose of the statute, *see* 142 CONG. REC. 22985 (1996) (statement of Sen. Lautenberg), and a single study from the Justice Department's Bureau of Justice Statistics, *see* U.S. Dep't of Justice, Bureau of Justice Statistics (July 11, 2007), http://www.ojp.usdoj.gov/bjs/homicide/intimates.htm (last visited Nov. 9, 2009). The study shows that 11% of all murder victims in the United States between 1976 and 2005 were killed by intimates; one-third of all female murder victims during this period were killed by an intimate; and between 1990 and 2005, over two-thirds of spouse and former-spouse homicide victims were killed with guns. Senator Lautenberg's floor statement and the DOJ study help establish the magnitude of the public-safety problem, but they do not specifically address the more pertinent questions of recidivism among offenders who commit domestic-violence misdemeanors and whether there is any relationship between ready access to a gun and the risk that a gun will be used against a domestic intimate. We have reason to believe both propositions have been studied, but that's based on our own research, not because the government has made its case.[7]

---

[7] *See, e.g.*, NORA K. PUFFETT & CHANDRA GAVIN, CTR. FOR CT. INNOVATION, PREDICTORS OF PROGRAM OUTCOME & RECIDIVISM AT

(continued...)

Accordingly, we cannot conclude on this record that the government has carried its burden of establishing a reasonable fit between the important objective of reducing domestic gun violence and § 922(g)(9)'s permanent disarmament of all domestic-violence misdemeanants. In fairness, because *Heller* did not establish a standard of review, the government did not know what its burden would be. Like the district court, it proceeded on the assumption that the highest standard of scrutiny applied and then relied almost entirely on conclusory reasoning by analogy from *Heller*'s reference to the "presumptive" constitutionality of felon-dispossession laws. That was a mistake, for the reasons we have explained. In any event, our discussion here of the appropriate standard of review should provide guidance for the proceedings on remand.

Before closing, we offer a few additional observations to help those proceedings along. Intermediate scrutiny tolerates laws that are somewhat overinclusive. *See, e.g.*, *Fox*, 492 U.S. at 480; *Anheuser-Busch, Inc. v. Schmoke*, 101

---

[7] (...continued)

THE BRONX MISDEMEANOR DOMESTIC VIOLENCE COURT 2 (2004), *available at* http://courtinnovation.org/_uploads/documents/ predictorsbronxdv.pdf (finding that over 60% of domestic-violence misdemeanants in the study were rearrested within two years of their initial offense, though only a small percentage of these rearrests were for weapons offenses); Jacquelyn C. Campbell et al., *Risk Factors for Femicide in Abusive Relationships: Results from a Multisite Case Control Study*, 93 AM. J. OF PUB. HEALTH 1089, 1092 (2003) (suggesting that access to firearms increases the risk of homicide by an intimate partner fivefold).

F.3d 325, 327-28 (4th Cir. 1996) (recognizing that intermediate scrutiny in the commercial-speech context allows some latitude between the regulation and the governmental objective). How much is too much is hard to say; it depends on the scope and reach of the law and how much room it leaves for the exercise of the right. *See Fox*, 492 U.S. at 481 (noting "the difficulty of establishing with precision the point at which restrictions become more extensive than their objective requires"). We note that § 922(g)(9) is overinclusive on several fronts: The firearms prohibition exists indefinitely;[8] it contains no exceptions nor any basis for potential restoration of gun rights; and it does not require an individualized finding of risk that the domestic-violence misdemeanant might use a gun in a future offense. On the other hand, the statutory definition of "misdemeanor crime of domestic violence" limits the applicability of § 922(g)(9)'s firearms disability to those who actually used or attempted to use physical force or threatened the use of a deadly weapon in a domestic disturbance. *See* 18 U.S.C. § 921(a)(33)(A)(ii). The statute thus targets a specific class of violent offender; only those who have already used or attempted to use force or have threatened the use of a deadly weapon against a domestic victim are banned from possessing firearms.

To summarize, we conclude that intermediate scrutiny applies to Skoien's Second Amendment challenge to this

---

[8] This contrasts with the temporary prohibition in 18 U.S.C. § 922(g)(8), which applies when a domestic-violence restraining order is entered but expires when the order is lifted.

§ 922(g)(9) prosecution. The government has the burden of establishing a reasonable fit between its important interest in reducing domestic gun violence and the means chosen to advance that interest—§ 922(g)(9)'s total disarmament of domestic-violence misdemeanants. Accordingly, we vacate Skoien's conviction and remand for further proceedings consistent with this opinion. If the government successfully discharges its burden, the district court shall reinstate Skoien's conviction.

VACATED AND REMANDED.