SYKES, Circuit Judge,
dissenting.
Steven Skoien was indicted under 18 U.S.C. § 922(g)(9) for possessing a hunting shotgun after he was convicted of a misdemeanor crime of domestic violence. He argued in the district court and reiterated here that applying the statute to his possession of a long gun for hunting violat *646 ed his Second Amendment right to keep and bear arms as explained in District of Columbia v. Heller, — U.S. -, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008).[1] The government invoked Heller’s anticipatory language about certain “presumptively lawful” firearms regulations — specifically, felon-dispossession laws — as a sort of “safe harbor” for analogous prohibitions. Heller, 128 S.Ct. at 2816-17 & n. 26; Brannon P. Denning & Glenn H. Reynolds, Heller, High Water(mark)? Lower Courts and the New Right to Keep and Bear Arms, 60 Hastings L.J. 1245, 1250 (2009) (noting that Heller’s dicta about “presumptively lawful” exceptions to the Second Amendment right may have opened a “safe harbor” for a wide swath of firearms regulation). This approach fell far short of the legal heavy lifting normally required to justify criminally punishing the exercise of an enumerated constitutional right.
The now-vacated panel opinion rejected the government’s argument and instead read Heller's holdings in light of its limiting language about exceptions, distilling a decision method focused first on a textual and historical inquiry into “the terms of the [Second Amendment] right as publicly understood when the Bill of Rights was ratified,” and then — if this inquiry didn’t resolve the case — an application of a degree of heightened judicial review appropriate to the nature of the challenged law’s burden on the right. United States v. Skoien, 587 F.3d 803, 809 (7th Cir.2009). Because the government hadn’t argued that domestic-violence misdemeanants were excluded from the scope of the Second Amendment right as a textual-historical matter, we assumed Skoien’s Second Amendment rights were intact. Id. at 810. Nor had the government tried to establish a strong relationship between the important governmental objective of reducing firearm violence against domestic intimates and § 922(g)(9)’s permanent disarmament of domestic-violence misdemeanants like Skoien. Id. at 814. So we vacated Skoien’s conviction and remanded for application of intermediate scrutiny on an appropriately developed record. Id. at 815-16.
The en banc court now performs the analysis that would have occurred on remand had we not reheard this case. That’s understandable, I suppose, given the considerable shift in the government’s approach before the en banc court. My colleagues flag the recalibration in Skoien’s argument on rehearing, Majority Op. at 644-45, but it is just as important— even more so, I think — that the government has (belatedly) developed arguments about the original meaning of the Second Amendment right and the means-end justification for § 922(g)(9). The government argued on rehearing that domestic-violence misdemeanants are excluded from the scope of the Second Amendment right as it was originally understood, or if they are not, that § 922(g)(9) survives intermediate scrutiny, at least as applied to Skoien.
My colleagues discuss but do not decide the scope question and avoid the standard-of-review “quagmire” by simply accepting the government’s “concession” that “some form of strong showing (‘intermediate scrutiny,’ many opinions say) is essential, and that § 922(g)(9) is valid only if substantially related to an important governmental objective.” Majority Op. at 641. When it comes to applying this standard, they give the government a decisive assist; most of the empirical data cited to sustain § 922(g)(9) has been supplied by the court. *647 This is an odd way to put the government to its burden of justifying a law that prohibits the exercise of a constitutional right. With respect, I cannot join the en banc opinion. The court declines to be explicit about its decision method, sends doctrinal signals that confuse rather than clarify, and develops its own record to support the government’s application of § 922(g)(9) to this defendant.
My colleagues start with an incomplete reading of the Supreme Court’s opinion in Heller. They say the Court held only that “the Second Amendment creates individual rights, one of which is keeping operable handguns at home for self-defense. What other entitlements the Second Amendment creates, and what regulations legislatures may establish, were left open. The opinion is not a comprehensive code; it is just an explanation for the Court’s disposition.” Majority Op. at 640.
I appreciate the minimalist impulse, but this characterization of Heller is hardly fair. It ignores the Court’s extensive analysis of the original public meaning of the Second Amendment and understates the opinion’s central holdings: that the Amendment secures (not “creates”) an individual natural right of armed defense not limited to militia service, Heller, 128 S.Ct. at 2801, and at the core of this guarantee is the right to keep and bear arms for defense of self, family, and home, id. at 2797-99; see also id. at 2817 (invalidating the District of Columbia’s ban on handgun possession because “the inherent right of self-defense has been central to the Second Amendment right” and the D.C. handgun ban “extends ... to the home, where the need for defense of self, family, and property is most acute”); McDonald v. City of Chicago, — U.S. -, 130 S.Ct. 3020, 3023, 177 L.Ed.2d 894 (2010) (plurality opinion) (The “central holding in Heller ” is “that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home.”). Heller was “the biggest Second Amendment ease ever decided,” [2] a “landmark ruling [that] merits our attention for its method as well as its result,”[3] “the most extensive consideration of the Second Amendment by the Supreme Court in its history,”[4] and “the most explicitly and self-consciously originalist opinion in the history of the Supreme Court.”[5] It is true that Heller left many issues open, but that is not an invitation to marginalize the Court’s holdings or disregard its decision method.
The en banc court reads Hellers reference to exceptions as a warning not to apply the opinion too broadly. Fair enough. This “precautionary language”— especially the inclusion of felon-disqualification laws on the list of “presumptively lawful” firearms regulations — is “informative” but not “dispositive,” and conveys a message that “whether or not technically dictum, a court of appeals must respect.” Majority Op. at 639-40, 641. I agree, and all the more so after McDonald.[6] 130 S.Ct. at 3047 (plurality opinion) (reiterating the presumptive validity of certain “longstanding regulatory measures”). But *648 my colleagues are not clear about how this limiting dicta should inform the constitutional analysis. The court thinks it “not ... profitable to parse these passages of Heller as if they contained an answer to the question whether § 922(g)(9) is valid,” Majority Op. at 640, but proceeds to parse the passages anyway. My colleagues read Heller’s dicta to mean that “statutory prohibitions on the possession of weapons by some persons are proper — and, importantly for current purposes, that the legislative role did not end in 1791. That some categorical limits are proper is part of the original meaning, leaving to the people’s elected representatives the filling in of details.” Id.
There are several problems with this analysis. First, no one has suggested that the legislative role ended in 1791; the pertinent question is how contemporary gun laws should be evaluated to determine whether they infringe the Second Amendment right. More significantly, that “categorical” disarmament is “proper” as “part of the original meaning” of the Second Amendment has not been established. Heller certainly did not say this; its reference to exceptions was — and remains— unexplained. See Heller, 128 S.Ct. at 2821 (“[Sjince this case represents this Court’s first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field.... [TJhere will be time enough to expound upon ... the exceptions we have mentioned....”); McDonald, at 3047 (plurality opinion) (repeating, without more, Heller’s “assurances” about exceptions).
My colleagues imply that the original meaning of the Second Amendment right excluded persons convicted of a crime, citing the Minority Report of the Pennsylvania ratifying convention, in which Pennsylvania’s dissenting Anti-Federalists proposed amendments to the new Constitution for the protection of individual rights, including the right to bear arms. Majority Op. at 640; see also Stephen P. Halbrook, The Founders’ Second Amendment: Origins of the Right to Bear Arms 195 (2008). The Pennsylvania dissenters proposed an amendment guaranteeing that “the people have a right to bear arms for defence of themselves and their own State or the United States, or for the purpose of killing game,” and providing that “no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals.” Bernard Schwartz, 2 The Bill of Rights: A Documentary History 662, 665 (1971). It is true that Heller identified this report as “highly influential” in the run-up to the Second Amendment, but it did so in the context of concluding that the Amendment codified an individual right not limited to militia service. 128 S.Ct. at 2804. There is no reference in Heller to the “unless” clause in the Pennsylvania dissenters’ proposal, and needless to say, this limiting language did not find its way into the Second Amendment.
The court also asserts that “[m]any of the states, whose own constitutions entitled their citizens to be armed, did not extend this right to persons convicted of crime.” Majority Op. at 640. This is a considerable overstatement. Only four state constitutions had what might be considered Second Amendment analogues in 1791 — Massachusetts, North Carolina, Pennsylvania, and Vermont — and none of these provisions excluded persons convicted of a crime. See Heller, 128 S.Ct. at 2802-03; McDonald, at 3037; see also Eugene Volokh, State Constitutional Rights to Keep and Bear Arms, 11 Tex. Rev. L. & Pol. 191, 197-204 (2006); Amar, supra note 2, at 172-73 & nn. 101-02. The sources cited by the court for this very broad proposition simply do not bear it out. To the contrary, two of the cited *649 works specifically emphasize the lack of founding-era evidence that persons convicted of a crime were categorically excluded from possessing firearms. See C. Kevin Marshall, Why Can’t Martha Stewart Have a Gun?, 32 Harv. J.L. & Pub. Pol’y 695, 728-35 (2009); United States v. McCane, 573 F.3d 1037, 1047-50 (10th Cir. 2009) (Tymkovich, J., concurring). The third, Stephen Halbrook’s The Founders’ Second Amendment, does not support the court’s suggestion that “many” states during the founding period imposed a general firearms disability on anyone convicted of a crime.[7]
Regardless, the court hazards these historical observations but ultimately leaves the matter unresolved, moving on to compare categorical limits on firearms possession to categorical limits on the freedom of speech: “obscenity, defamation, incitement to crime, and others.”[8] Majority Op. at 641. Adapting First Amendment doctrine to the Second Amendment context is sensible in some cases; indeed, Heller expressly approved the comparison of the Second Amendment to the First. See 128 S.Ct. at 2799, 2821; see also Eugene Volokh, Implementing the Right To Keep and Bear Anns for Self-Defense: An Analytical Framework and a Research Agenda, 56 UCLA L.Rev. 1443, 1449, 1452, 1454-55 (2009); Nelson Lund, The Second Amendment, Heller, and Originalist Jurisprudence, 56 UCLA L.Rev. 1343, 1375-76 (2009) . But this particular First Amendment analogy doesn’t work here. Obscenity, defamation, incitement, and so on are among the few “ ‘well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem.’ ” United States v. Stevens, — U.S. -, 130 S.Ct. 1577, 1584, 176 L.Ed.2d 435 (2010) (quoting Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)). These “historic and traditional categories [of speech] long familiar to the bar” are “outside the reach of that Amendment altogether — [] they fall into a ‘First Amendment Free Zone.’ ” Id. at 1584-85 (quotation marks omitted).
But my colleagues elide the historical-scope question; they do not decide whether persons convicted of a domestic-violence misdemeanor are completely “outside the reach” of the Second Amendment as a matter of founding-era history and background legal tradition. For this analogy to hold up, the court would have to make a judgment on the matter. Absent that, it’s hard to make sense of the court’s reliance *650 on this strain of First Amendment doctrine.[9]
Moreover, it is one thing to say that certain narrowly limited categories of speech have long been understood to fall outside the boundaries of the free-speech right and are thus unprotected by the First Amendment. It is quite another to say that a certain category of persons has long been understood to fall outside the boundaries of the Second Amendment and thus may be excluded from ever exercising the right. The relevant question for our purposes is whether domestic-violence misdemeanants are wholly unprotected by the Second Amendment. By invoking this line of First Amendment caselaw, my colleagues imply an affirmative answer, but do not see the analysis through.[10]
The better approach is to acknowledge the limits of the scope inquiry in a more straightforward way: The historical evidence is inconclusive at best. As noted in the panel opinion, scholars disagree about the extent to which felons — let alone misdemeanants — were considered excluded from the right to bear arms during the founding era. Compare, e.g., Marshall, supra, at 714-28 (the founding-era understanding of the right to keep and bear arms for self-defense did not categorically exclude persons convicted of a crime), with Don B. Kates & Clayton E. Cramer, Second Amendment Limitations and Crimi *651 nological Considerations, 60 Hastings L.J. 1339, 1359-64 (2009) (the founding generation understood that persons convicted of common-law felonies could be disarmed), and Don B. Kates, Jr., Handgun Prohibition and the Original Meaning of the Second Amendment, 82 Mich. L.Rev. 204, 266 (1983) (same); see also Adam Winkler, Heller’s Catch-22, 56 UCLA L.Rev. 1551, 1562-66 (2009); Lund, supra, at 1356-57; Glenn Harlan Reynolds, A Critical Guide to the Second Amendment, 62 Tenn. L.Rev. 461, 480 (1995) (collecting originalist scholarship). We simply cannot say with any certainty that persons convicted of a domestic-violence misdemeanor are wholly excluded from the Second Amendment right as originally understood.[11] Because Skoien is not categorically unprotected, the government’s use of § 922(g)(9) against him must survive Second Amendment scrutiny.[12]
My colleagues evidently agree; they move on to discuss the standard for determining whether the disarmament of domestic-violence misdemeanants is constitutionally permissible. This inquiry is necessary only if Skoien’s Second Amendment rights are intact notwithstanding his domestic-violence conviction. The court properly concludes that some form of heightened judicial scrutiny is required; rational-basis review has been ruled out. Heller, 128 S.Ct. at 2818 n. 27 (“If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect.”); Majority Op. at 641-42. The court assumes without deciding that intermediate scrutiny applies, and holds that data establish a substantial relationship between § 922(g)(9) and the important governmental objective of “preventing armed mayhem.” Id. What follows is a discussion of the Supreme Court’s decision in United States v. Hayes, — U.S. -, 129 S.Ct. 1079, 172 L.Ed.2d 816 (2009) — in particular, its reference to a statement in the congressional record by the principal Senate sponsor of § 922(g)(9) — and several pages of social-science research on the criminal-justice system’s treatment of domestic-violence cases, firearm violence in the home, and recidivism by domestic-violence offenders. Most of this data, as I have noted, has been supplied by the court.
The court thus accepts that it is the government’s burden to make a “strong *652 showing” of the danger-reduction justification for stripping domestic-violence misdemeanants of their Second Amendment rights but in the end makes the case for itself. This relieves the government of its burden and deprives Skoien of the opportunity to review the outcome-determinative evidence, let alone subject it to normal adversarial testing. One obvious peril in this approach: The court’s understanding of the research on domestic violence might be mistaken. That is certainly true of my colleagues’ conclusion that “domestic abusers often commit acts that would be charged as felonies if the victim were a stranger, but that are charged as misdemeanors because the victim is a relative.” Majority Op. at 643. The court has misread the materials it cites for this conclusion, which document the well-recognized difficulty of prosecuting domestic violence because of victim fear or noneooperation but do not establish that acts of domestic violence are “often” chargeable as felonies but for the domestic dynamic. Perhaps the government can discharge its burden in this case, but the place for it to do so in the first instance is in the district court, not the court of appeals.[13]
The court also dismisses Skoien’s contention that § 922(g)(9) is impermissibly overinclusive because it is a permanent disqualification and provides no effective way for an offender to reacquire his Second Amendment rights. It is true, as the court notes, that a pardon, expungement, or restoration of civil rights will lift the federal firearms ban. See 18 U.S.C. § 921(a)(33)(B)(ii) (excluding domestic-violence convictions that have been pardoned, expunged, or for which civil rights have been restored unless the pardon, expungement, or restoration of rights provides that the person may not possess firearms). But as my colleagues acknowledge, in Wisconsin misdemeanants do not lose their civil rights, and rights not lost cannot be “restored” for purposes of the statutory exception. See Logan v. United States, 552 U.S. 23, 36, 128 S.Ct. 475, 169 L.Ed.2d 432 (2007). The court nonetheless maintains that “the state does give misdemeanants an opportunity to seek pardon or expungement.” Majority Op. at 645. Pardon, yes; expungement, no — at least not in the typical case. In Wisconsin the ex-pungement remedy is extremely narrow; it applies only to misdemeanants under the *653 age of 21 and must be ordered at the time of sentencing.[14] Wis. Stat. § 973.015(l)(a). There is no after-the-fact or generally available opportunity to seek expungement. It is true that the pardon power is very broad, but I doubt that governors — in Wisconsin or elsewhere — pardon domestic-violence misdemeanants with any regularity. So Skoien is right that the § 922(g)(9) ban is effectively permanent, at least as to him.[15]
This brings me to the court’s final point: that Skoien is “poorly situated” to complain about the perpetual nature of the § 922(g)(9) ban because he is a recidivist who was caught with “multiple guns just one year after [his] second conviction— while he was still on probation.” [16] Majority Op. at 645. Maybe so. Skoien’s status as a recent domestic-violence recidivist certainly diminishes the force of his argument about the permanent feature of § 922(g)(9) as the statute has been applied to him. The court properly reserves the question whether application of § 922(g)(9) would survive a Second Amendment challenge by “a misdemeanant who has been law abiding for an extended period.” Majority Op. at 645. Still, I think it highly inappropriate for the court to resolve this challenge to the application of the statute without requiring the government to shoulder its burden — and giving Skoien the opportunity to respond — on remand in the district court. The sort of empirical inquiry normally required by intermediate scrutiny should not be performed by the court of appeals in the first instance.[17]
*654 The court thus short-circuits the usual process -and resolves this case on a record of its own creation, prematurely ending Skoien’s challenge and leaving markers for the future that will immunize most applications of § 922(g)(9) from serious Second Amendment scrutiny. This approach is difficult to reconcile with either the reasoning or the result in Heller, though it might be thought consistent with an aggressive reading of the Court’s reference to presumptively lawful firearms regulations. Of course there are several ways to understand the Court’s analysis in Heller in light of its limiting dicta about exceptions.[18] But we cannot read Hellers dicta in a way that swallows its holdings. The government normally has the burden of justifying the application of laws that criminalize the exercise of enumerated constitutional rights. We should follow that norm, not pay lip service to it. I would remand for the government to make its own case for imprisoning Steven Skoien for exercising his Second Amendment rights.

. The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.” U.S. Const, amend. II.

. Akhil Reed Amar, Heller, HLR, and Holistic Legal Reasoning, 122 Harv. L.Rev. 145, 147 (2008).

. Id.

. Sanford Levinson, United States: Assessing Heller, 7 Int’l J. Const. L. 316, 319 (2009)

. Cass R. Sunstein, Second Amendment Minimalism: Heller as Griswold, 122 Harv. L.Rev 246, 246 (2008).

. The Supreme Court held in McDonald that the Second Amendment “applies equally to the Federal Government and the States.” McDonald v. City of Chicago, -U.S.-, 130 S.Ct. 3020, 3050, 177 L.Ed.2d 894 (2010) (plurality opinion).

. The author is legal counsel to the National Rifle Association and filed an amicus brief in support of the defendant in this case; he will probably be surprised to see his work construed in this way.

. Before moving to the First Amendment comparison, however, the court briefly traces the history of federal felon-dispossession laws, noting that the “first federal statute disqualifying felons from possessing firearms was not enacted until 1938” and that this law “also disqualified misdemeanants who had been convicted of violent offenses.” Majority Op. at 640. The court then compares § 922(g)(9) to the 1938 Act insofar as "§ 922(g)(9) ... like the 1938 Act is limited to violent crimes.” Id. at 640-41. This is a little misleading. Sec-lion 2(f) of the 1938 Federal Firearms Act (15 U.S.C. §§ 901-910, repealed, Pub.L. 90-351, June 19, 1968) created the first federal firearms disability and made it "unlawful for any person who has been convicted of a crime of violence ... to receive any firearm or ammunition which has been shipped or transported in interstate commerce.” A “crime of violence” was defined in § 1(6) of the Act as "murder, manslaughter, rape, mayhem, kidnaping, burglary, housebreaking; assault with intent to kill, commit rape, or rob; assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment for more than one year.” Of these, housebreaking is likely the only misdemeanor. The rest of the listed crimes are serious violent felonies.

. The court mentions New York v. Ferber, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (child pornography), and Garcetti v. Ceballos, 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006) (public-employee speech), as examples of cases approving categorical limits on speech that lack roots in First Amendment history and tradition. Majority Op. at 641. As the Supreme Court made clear in Stevens, however, “Ferber presented a special case: The market for child pornography was 'intrinsically related' to the underlying abuse, and was therefore 'an integral part of the production of such materials, an activity illegal throughout the Nation.' 130 S.Ct. at 1586 (quoting Ferber, 458 U.S. at 759, 761, 102 S.Ct. 3348). Ferber held that the First Amendment has never been understood to protect "speech or writing used as an integral part of conduct in violation of a valid criminal statute.” 458 U.S. at 762, 102 S.Ct. 3348. As such, Ferber "grounded its analysis in a previously recognized, long-established category of unprotected speech.” Stevens, 130 S.Ct. at 1586.
Garcetti did not hold that public-employee speech is wholly unprotected; when public employees “speak[] as citizens about matters of public concern,” the First Amendment "limits the ability of a public employer to leverage the employment relationship to restrict” that speech. 547 U.S. at 419, 126 S.Ct. 1951. Garcetti drew a distinction between a bona fide free-speech claim by a public employee and a mere employment grievance: "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.” Id. at 421, 126 S.Ct. 1951. As the Supreme Court explained: "Underlying our cases has been the premise that while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.' ” Id. at 420, 126 S.Ct. 1951 (quoting Connick v. Myers, 461 U.S. 138, 154, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). Garcetti thus declined to expand the traditional understanding of the free-speech rights of public employees in order to prevent the "constitutionalization” of employment disputes about statements made in the course of carrying out job-related duties. Id.
It's worth noting as well the Court's caution in Stevens: "Ferber and other cases cannot be taken as establishing a freewheeling authority to declare new categories of speech outside the scope of the First Amendment.” 130 S.Ct. at 1586.

. This particular analogy is inapt for other reasons that need not be elaborated here. See generally Eugene Volokh, The First and Second Amendments, 109 Colum. L.Rev. Sidebar 97 (2009) (explaining why the analogy between the Second Amendment and First Amendment obscenity jurisprudence is flawed).

. No one argues that Skoien's possession of a hunting shotgun for hunting is unprotected as a matter of the Second Amendment's original meaning. See Heller, 128 S.Ct. at 2801 ("Americans valued the ancient right ... for self-defense and hunting." (emphasis added)).

. McDonald did not elaborate on how this analysis should proceed. The plurality reiterated Heller’s point that the scope of the Second Amendment right should not be determined by "judicial interest balancing.” 130 S.Ct. at 3047 (plurality opinion) ("In Heller, ... we expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial intei'est balancing.”). But the plurality did not address how infringement claims should be decided if the inquiry into the original scope of the right doesn’t clearly exclude the claim or conclusively resolve it against the government, as in Heller itself. See Heller, 128 S.Ct. at 2821 ("[W]hatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.”). Heller hinted that the Court's heightened-scrutiny jurisprudence remains relevant. See 128 S.Ct. at 2817 (The D.C. handgun ban is invalid "[u]nder any of the standards of scrutiny that we have applied to enumei'ated constitutional rights.”). Unless every claimed infringement of the right gets strict scrutiny — a proposition difficult to reconcile with Heller's reference to presumptively lawful firearms regulations— we are left to choose from among the Court’s "intermediate” standards of judicial review.

. On rebriefing before the en banc court, the government cited several reports showing high recidivism rates among domestic violence offenders. See Carla Smith Stover, Domestic Violence Research: What Have We Learned and Where Do We Go From Here?, 20 J. of Interpersonal Violence 448 (2005); Julia C. Babcock, et al., Does Batterers’ Treatment Work? A Meta-Analytic Review of Domestic Violence Treatment, 23 Clinical Psychol. Rev 1023 (2004); John H. Laub & Robert J. Sampson, Understanding Desistance From Crime, 28 Crime and Justice 1 (2001); John Wooldredge & Amy Thistlethwaite, Reconsidering Domestic Violence Recidivism: Individual and Contextual Effects of Court Dispositions and Stake in Conformity, Project Report Submitted to the Nat’l Inst, of Justice (1999), available at http://www.ncjrs.gov/pdffilesl/nij/ grants/188509.pdf (last visited June 30, 2010). On the more precise question of the relationship between ready access to a gun and the risk that a gun will be used against a domestic intimate, the government cited two studies showing a correlation: Jacqueline C. Campbell, et al., Risk Factors for Femicide in Abusive Relationships: Results from a Multisite Case Control Study, 93 Am. J. of Pub. Health 1089 (2003), and Arthur L. Kellermann, et al., Gun Ownership as a Risk Factor for Homicide in the Home, 329 New Eng. J. Med. 1084 (1993). The most recent of these, however, also establishes that a "prior arrest for domestic violence actually decreased the risk for femicide, suggesting that arrest of abusers protects against future intimate partner femicide risks.” Campbell, supra, at 1092. Another study cited by the government shows that domestic assaults with a firearm are more likely to result in death than domestic assaults with other types of weapons. See Linda E. Saltzman, et al., Weapon Involvement and Injury Outcomes in Family and Intimate Assaults, 267 JAMA 3043 (1992).

. The statute was amended in the 2009 budget bill to make expungement available to offenders under the age of 25 and to broaden the class of crimes covered to include some minor felonies. 2009 Wis. Act 28 §§ 3384-3386. But it remains true that expungement must be ordered at the time of sentencing, and the amendment applies only to sentencing proceedings occurring after the Act's effective date, July 1, 2009. Id. at § 9309(1). Skoien was over 21 when convicted of domestic battery and was sentenced prior to the amendment’s effective date.

. My colleagues engage in some overbroad generalization about the availability of ex-pungement in "[s]ome of the largest states,” Majority Op. at 645, citing the expungement statute in just one — California—and a law-review article the relevant passages of which are sourced to a few anecdotal newspaper articles and emails to the author from crime-data technology managers in four states. From this meager evidence, my colleagues confidently conclude that " § 922(g)(9) in its normal application does not create a perpetual and unjustified disqualification for a person who no longer is apt to attack other members of the household.” Id. This statement is gratuitous and unsupported.

. The court's reference to "multiple guns” requires some elaboration. Skoien’s conviction was based on his possession of the hunting shotgun, which he admitted using to kill a deer on the morning of his arrest. Two other guns were found in his home: a handgun and a hunting rifle. The prosecutor conceded that he could not prove the handgun and rifle were Skoien's; there was evidence suggesting that the handgun belonged to Skoien's wife and the rifle belonged to their roommate. Nonetheless, at sentencing Skoien did not contest constructive possession of the two additional guns for purposes of increasing his base offense level by two levels under U.S.S.G. § 2K2.1(b)(1)(A). The parties agreed that the handgun “was maintained for protection of the home” (these are the prosecutor's words), and Skoien told the court at sentencing that there had been several attempted break-ins at his home.

. My colleagues close with another inappropriate analogy. They say that "[i]f convictions may be used to limit where sex offenders can live (and whether they must register), see Connecticut Department of Public Safety v. Doe, 538 U.S. 1, 123 S.Ct. 1160, 155 L.Ed.2d 98 (2003), a disqualification-on-conviction statute such as § 922(g)(9) also is generally proper.” Majority Op. at 645. This statement is both unnecessary and — in the context of this case — completely misplaced. Connecticut Department of Public Safety was a procedural due-process case involving a Connecticut statute requiring sex offenders to register upon release and periodically update the in *654 formation required by the registry. 538 U.S. at 5-6, 123 S.Ct. 1160. A class of recently released offenders brought a pre-enforcement challenge to the statute and argued that a contemporaneous hearing on their present dangerousness was necessary to sustain the registration requirement as a matter of procedural due process. The Supreme Court summarily disagreed, saying the offenders had received all the process they were due when they were convicted of the underlying offense. Id. The Connecticut statute did not “limit where sex offenders can live,” and the case does not remotely support the proposition that under the Second Amendment, a "disqualification-on-conviction statute such as § 922(g)(9) ... is generally proper.”

. See, e.g., Volokh, Implementing the Right To Keep and Bear Arms for Self-Defense, supra, at 1445-72; Lund, supra, at 1372-75; Winkler, supra, at 1572-75; Mark Tushnet, Permissible Gun Regulations After Heller: Speculations About Method and Outcomes, 56 UCLA L.Rev. 1425, 1426-32 (2009); Lawrence B. Solum, District of Columbia v. Heller and Originalism, 103 NW. U.L. REV. 923, 972-80 (2009); Levinson, supra note 4, at 322-23; Pamela S. Karlan, Bullets, Ballots, and Battles on the Roberts Court, 35 Ohio N.U.L.Rev. 445, 452-56 (2009); Brannon P. Denning & Glenn H. Reynolds, Five Takes on District of Columbia v. Heller, 69 Ohio St. L.J. 671, 688-99 (2008); Sunstein, supra note 5, at 267-73; Brannon P. Denning, The New Doctrinalism in Constitutional Scholarship and District of Columbia v. Heller, 75 Tenn L.Rev. 789, 797-800 (2008).